

# IN THE
# TENTH COURT OF APPEALS

## No. 10-11-00277-CR

**BOBBY JOE BUCKNER,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 54th District Court
McLennan County, Texas
Trial Court No. 2009-385-C2**

## MEMORANDUM OPINION

A jury convicted Appellant Bobby Joe Buckner of aggravated sexual assault of a child, and the trial court assessed his punishment at fifty years' imprisonment. This appeal ensued.

### Sufficiency of the Evidence

In his first issue, Buckner contends that the evidence is insufficient to prove that he committed an aggravated sexual assault.

The Court of Criminal Appeals has expressed our standard of review of a

sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011), *cert. denied*, 132 S.Ct. 2712 (2012).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

As limited by the indictment, a person commits the offense of aggravated sexual

assault if (1) he intentionally or knowingly: "(i) causes the penetration of the anus or female sexual organ of a child by any means; [or] . . . (iii) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor"; and (2) the victim is younger than fourteen years of age. Act of May 28, 1999, 76th Leg., R.S., ch. 417, § 1, 1999 Tex. Gen. Laws 2752, 2752 (amended 2003) (current version at TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i) & (iii), (2)(B) (West Supp. 2012)).

The evidence presented in this case, viewed in the light most favorable to the verdict, is as follows: Waco Police Detective Maria Bucher, who is assigned to the Crimes Against Children Unit, testified that she interviewed A.L. in 2008, when A.L. was fifteen years old, regarding an alleged sexual assault. A.L. seemed comfortable talking to her and was very straightforward in her answers to questions. Detective Bucher recalled that when they talked about what had happened to A.L., A.L. became very emotional to the point that her voice was quivering. Detective Bucher stated that A.L.'s behaviors seemed appropriate given the nature of the allegations she was making.

Through a conversation with A.L.'s mother, Detective Bucher had discovered that the first person A.L. told about the incident was A.L.'s grandmother, whom Detective Bucher also interviewed. Detective Bucher stated that in her interviews with A.L.'s mother and grandmother, she was not given the impression that they were just trying to get Buckner in trouble. Detective Bucher said that the outcry in this case was not immediate but that that did not concern her because it is not uncommon. Detective

Bucher was also unable to retrieve any scientific evidence in her investigation but explained that neither is that unusual. Detective Bucher ultimately obtained an arrest warrant for Buckner.

A.L., who was eighteen years old at the time of trial, testified that when she was seven years old and in the first grade, her mother dated Buckner. One afternoon in April 2000, when A.L. was seven, Buckner picked her up from school and took her home to her apartment. She did not remember ever being alone with Buckner before that time. They were watching cartoons in the living room when Buckner asked her if she could keep a secret. She knew that her mother did not usually allow her to have candy, so she thought that was what he was talking about. She asked Buckner if she could have some candy, and he said that she could. She got some candy and returned, and they continued to watch television. At some point, Buckner had A.L. lay down in the living room. She had been born with a bladder condition that still required her to see an urologist, so she assumed that Buckner was making her lay down to help her. Buckner then started undoing and pulling down her skort. The living room windows were partially open, so A.L. became embarrassed and said something like "not in here." Buckner then told her to go into the bathroom, take off her clothes, and meet him in the bedroom of the single-bedroom apartment.

A.L. testified that she went to the bathroom and then met Buckner in the bedroom. Buckner was at the foot of the bed and told her to lie down. A.L. complied. Buckner knelt on the bed and spread her legs. She asked him if he could help her with her bladder problem, and he replied that he could. Buckner then unfastened his pants

and pulled out his penis. A.L. looked away. A.L. stated that, based on what she knows now, she would describe their interaction as intercourse, meaning penetration. She stated that Buckner put his penis inside her vagina. A.L. said that when she got up to get dressed, she felt pain between her legs and in her lower abdomen. When asked on cross-examination if she did not remember exactly what happened, A.L. replied that she recalled some of it and that she recalled the sensations afterward so "it was pretty apparent what had taken place." She stated that Buckner must have penetrated her because the pain was so excruciating afterward that she blocked it.

A.L. testified that after the incident, they went and picked her mother up from work. A.L. did not tell her mother what had happened at that point, and the relationship between Buckner and her mother did not last much longer. A.L. did not testify to any other sexual encounters with Buckner, but she remembered an occasion when she was sitting in a truck between Buckner and her mother, and he pulled out a pocketknife and was showing it to her mother. He held the pocketknife in front of her face. She was scared and felt as though he was threatening her. Buckner did not say anything to her at that time, but at some point, he did tell her not to tell her mother what had happened.

A.L. testified that she was very close to her grandmother because her grandmother helped raise her in place of her father. A.L. told her grandmother part of what had happened with Buckner in October of the next year. She told her grandmother only that Buckner had touched her inappropriately. Her grandmother then told A.L.'s mother. When A.L. was fourteen years old, she finally told everything

that had happened with Buckner to her boyfriend R.S.  R.S. encouraged her to tell her mother and grandmother.  A.L. said that a week or two later, she told her grandmother and mother that there had actually been intercourse with Buckner.  A.L. did not want to report it to the police, but after her grandmother "badgered [her] for a year" about it, she agreed to report it to the police.

Sanya, A.L.'s mother, testified that A.L., her only child, had some medical issues as a child.  A.L.'s bladder was too small for her body, which caused her to have urinary tract infections (UTIs) and accidents.  Except for the UTIs, however, A.L. had no other pain associated with her bladder problem.  A.L. saw urologists frequently, and she was used to taking off her clothes and putting on a gown when she saw the doctor.

Sanya testified that she met Buckner around the end of March 2000.  They began dating, and she introduced him to A.L. and her mother a couple of weeks later.  She gave Buckner her key to the apartment, and he stayed there during the day when he was not working.  She thought she allowed Buckner to pick A.L. up from school "about two times."  She never used Buckner as a babysitter, and if he picked A.L. up from school, they were supposed to immediately pick her up from work.  She did not know that Buckner was ever alone at the apartment with A.L.  Sanya and Buckner ended their relationship at the beginning or middle of May.

Sanya recalled that at the end of April or beginning of May, A.L. did not want to be at the apartment anymore and wanted to stay with her grandmother all the time.  A.L. also told Sanya that she did not want to see a male doctor anymore, so Sanya found her a female doctor.  As A.L. got older, she started dressing in darker colors and

was getting more depressed and unhappy. At the recommendation of a physician, A.L. began seeing a therapist when she was about eight or nine years old. She was diagnosed with ADHD and depression and was prescribed medication. A.L. tried to commit suicide a few times. Sanya also discovered that A.L. was cutting herself.

Sanya testified that about a year and a half after she and Buckner had ended their relationship, her mother told her that something had happened between Buckner and A.L. Sanya asked A.L. if it was true, and A.L. said that Buckner had touched her inappropriately. Sanya asked A.L. if Buckner had done more than touch her, and A.L. said no. Sanya did not push A.L. to talk about it because A.L. did not want to talk about it. Sanya encouraged A.L. to talk to her therapist about it, but A.L. did not. Sanya did not go to the police at that time because A.L. did not want to tell the police. Sanya also knew that Buckner was no longer in Texas, so she felt like the threat had been removed.

Sanya testified that after A.L. started dating R.S. when she was about fourteen or fifteen, A.L. finally told Sanya and Sanya's mother that Buckner had "raped" her. Sanya took that to mean that Buckner had forced sex on her. A.L. said that she had been afraid to tell Sanya or Sanya's mother because Buckner had threatened to hurt them. Sanya knew that A.L. had seen Buckner's pocketknife. Sanya wanted A.L. to go to the police, but A.L. would not go because she did not want to talk about it. About a year later in 2008, however, Sanya was able to talk A.L. into going to the police.

Margaret, A.L.'s grandmother, testified that she first met Buckner in late March or early April and told him that she did not approve of him. Margaret stated that he

"just felt evil." Margaret did not think that A.L. ever heard her say that she did not approve of Buckner, but she did not know for sure. She thought Sanya dated Buckner for about a month and a half.

Margaret testified that in October 2001, she and A.L. were watching a scary movie when A.L. said, "I have something to tell you." A.L. told her that Buckner had touched her inappropriately. Margaret stated that she "freaked" and started crying. She asked A.L. when it had happened, and A.L. said it had been about a year. Margaret asked A.L. why she had not said something before, and A.L. responded that Buckner said that he would kill her, Sanya, and Margaret. A.L. told Margaret that Buckner always had a knife that he would put where she could see it. Margaret asked A.L. if Buckner had raped her, but A.L. would not tell her. Margaret wanted to call the police, but A.L. did not want her to. Margaret told Sanya about what A.L. had told her, and Sanya talked to A.L. about it. At some point after A.L. made her initial outcry to Margaret, one of A.L.'s pediatricians asked whether anyone had touched A.L. inappropriately, and Margaret said "no."

Margaret testified that when A.L. was fourteen, Margaret found out that Buckner had raped A.L. A.L. had told Sanya about it shortly after she had told her boyfriend. Margaret had tried to get A.L. to go to the police, but she would not go.

Dr. William Lee Carter testified that he is a psychologist but that he had not provided counseling or therapy to A.L. He was asked by the prosecutor to observe A.L. while she testified. Among other things, Dr. Carter stated that A.L.'s depiction of the incident with Buckner was classic of dissociation. He explained that when a child is in

the midst of trauma for which he or she was completely unprepared, the child may zone out as a means of pushing through the situation. Dr. Carter stated that that helps explain why A.L. does not remember the details after she was naked and lying on the bed. Furthermore, Dr. Carter testified that it is common for children who have been sexually abused to tell some of what happened to them and then wait to tell the rest of the story after years had gone by, just as A.L. did.

Dr. Deborah Brock, a clinical psychologist, testified that she treated A.L. from January 2004 to September 2005. In discussing A.L.'s history during intake, Sanya informed Dr. Brock that A.L. had been touched inappropriately "several years before." Dr. Brock later confronted A.L. with the information. A.L. affirmed it but did not elaborate. Dr. Brock specifically inquired whether the incident involved intercourse or oral sex, and A.L. denied both. Dr. Brock did not recall A.L. making allegations of sexual abuse against anyone else.

Dr. Brock testified that she and A.L. developed a "fair relationship" during the course of A.L.'s treatment. She thought that A.L. felt comfortable with her. A.L. knew that Dr. Brock would occasionally discuss what happened during the sessions with Sanya and Margaret. But A.L. did talk to Dr. Brock about problems she had with boys, with Sanya, with Margaret, with school, and with herself.

Buckner argues that the foregoing evidence is insufficient to prove contact or penetration of A.L.'s vagina by or with his penis and that, therefore, the evidence at best supports a conviction only for indecency with a child by contact, namely, that he

touched A.L.'s vagina with his hand.[1]  In support of this argument, Buckner points to the fact that A.L. made no allegation of sexual abuse until a year and a half after he allegedly sexually assaulted her and that, even then, she only alleged that he touched her inappropriately.  Buckner also emphasizes that A.L. did not allege that he "raped" her until sometime in 2007, seven years after he allegedly sexually assaulted her, even though she had received psychological treatment that specifically addressed sexual abuse.  Buckner stresses that A.L.'s testimony was also very vague on the issue of penetration.  Finally, Buckner claims that Margaret strongly disliked him and therefore had a strong motive to persuade A.L. to make false allegations against him.

The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony.  *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).  A jury may believe all, some, or none of any witness's testimony.  *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  Here, A.L. testified to all of the elements of the offense, and, by finding Buckner guilty, the jury obviously believed A.L.'s testimony and rejected Buckner's arguments.  As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony."  *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).

Viewing all the evidence in the light most favorable to the verdict, we thus

---

[1] The former version of section 21.11 of the Penal Code entitled "Indecency With a Child" provided in pertinent part:  "A person commits an offense if, with a child younger than 17 years and not his spouse, whether the child of the same or opposite sex, he . . . engages in sexual contact with the child."  Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3616 (amended 2001 & 2009) (current version at TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011)).

conclude that a rational trier of fact could have found Buckner committed the offense of aggravated sexual assault beyond a reasonable doubt. We overrule Buckner's first issue.

## Dr. Brock's Testimony

In his second issue, Buckner contends that the trial court abused its discretion in admitting Dr. Brock's testimony regarding A.L.'s sexual abuse allegations under Rule of Evidence 803(4) because the statements were made to Dr. Brock by a third-party declarant.

In a hearing outside the jury's presence, Dr. Brock testified as follows:

> Q      (BY [Prosecutor])  I believe the question that I was just trying to ask you is, um, did you learn anything about a sexual abuse history that [A.L.] had experienced?
>
> A      Yes.  I was told that there was, um, some touching and -- by the mother's boyfriend, um, two or three years before I had seen her, because I saw her when I think she was 10.  And, um --
>
> Q      Who provided that information to you?
>
> A      Um, mother did.
>
> Q      Was that information provided in furtherance of treatment for [A.L.]?
>
> A.      Yes.  It was part of the treatment history.  I mean, as far as the person's history.
>
> Q      Was that also provided as information you could use in treating the family unit and the problems that they were experiencing?
>
> A      Sure.
>
> Q      Is that information that you needed in order to properly treat both [A.L.], Margaret and Sanya []?

A    Yes.

Q    Did she -- oh, did [A.L.] confirm to you at any point during your treatment of the family that she had been touched by her mother's boyfriend?

A    Yes.

Q    She was not the source of the information originally. Did you have to confront her with that at some time during her treatment?

A    Yes.

Q    Did she ever elaborate and provide further details with you?

A    No.

Buckner made the following objection:

Well, the objection, Judge, is that it's now we basically have hearsay upon hearsay. We have -- you know, they're offering this on a medical exception -- the medical exception to the hearsay rule, but it's a statement made by the mother to the -- the psychologist about what the child has told her. So it's not only -- it's double hearsay as well.

The trial court overruled the objection, and Dr. Brock testified to the foregoing in the jury's presence.

Even if we conclude that Dr. Brock's testimony in the foregoing exchange was inadmissible hearsay, we hold that Buckner was not harmed by admission of the testimony. The admission of otherwise inadmissible hearsay is non-constitutional error, which we disregard if the error did not affect the appellant's substantial rights. TEX. R. APP. P. 44.2(b); *Moon v. State*, 44 S.W.3d 589, 594-95 (Tex. App.—Fort Worth 2001, pet. ref'd). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.

App. 1997).

The outcome of this case turned on A.L.'s credibility, which was not strengthened by Dr. Brock's statement. Furthermore, A.L. and Margaret both testified that in October 2001 A.L. told Margaret that Buckner had touched A.L. inappropriately and that Margaret had then told Sanya about it. Sanya confirmed in her testimony that about a year and a half after she and Buckner had ended their relationship, Margaret told her that something had happened between Buckner and A.L. Sanya asked A.L. if it was true, and A.L. said that Buckner had touched her inappropriately. In light of this testimony, we cannot conclude that Dr. Brock's mere statement that, at the outset of her treatment of A.L., Sanya told her that one of her former boyfriends had inappropriately touched A.L. had a substantial and injurious effect or influence on the jury's verdict.

Therefore, we conclude that even if the trial court erred in admitting Dr. Brock's testimony as stated above, the error did not affect Buckner's substantial rights. *See* TEX. R. APP. P. 44.2(b). We overrule Buckner's second issue.

## Conclusion

Having overruled both of Buckner's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed July 11, 2013
Do not publish
[CRPM]